# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ──────────────────────────── ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Criminal Action |
| TERRENCE PYRTLE, ) | No. 23-cr-10116-PBS |
| ) | |
| Defendant. ) | |
| ──────────────────────────── ) | |

## MEMORANDUM AND ORDER

March 12, 2025

Saris, D.J.

## INTRODUCTION

A federal grand jury indicted Defendant Terrence Pyrtle on three drug trafficking counts and nine counts relating to access device fraud and aggravated identity theft.[1] Pyrtle moves to suppress evidence obtained from the execution of search warrants

_____

[1] Specifically, the indictment charges Pyrtle with 1) one count of conspiracy to distribute and possess with intent to distribute at least 500 grams of cocaine, 400 grams of fentanyl, 100 grams of fentanyl analogue, and methamphetamine in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(vi), (b)(1)(B)(ii), and (b)(1)(C); 2) one count of possession with intent to distribute the same quantities of controlled substances in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vi), (b)(1)(B)(ii), and (b)(1)(C); 3) one count of possession with intent to distribute at least 400 grams of fentanyl and at least 100 grams of fentanyl analogue in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vi); 4) one count of conspiracy to commit access device fraud and aggravated identity theft in violation of 18 U.S.C. § 371; 5) four counts of access device fraud and aiding and abetting the same in violation of 18 U.S.C. §§ 1029(a) and 2; and 6) four counts of aggravated identity theft and aiding and abetting the same in violation of 18 U.S.C. §§ 1028A(a)(1) and 2.

at two apartments located in Braintree and Somerville, Massachusetts. He argues primarily that various warrants issued during the investigation into his drug trafficking activities were not supported by probable cause, that the search warrants for the two apartments were insufficiently particularized, and that the good-faith exception to the exclusionary rule does not apply.

After hearing, the Court **DENIES** Pyrtle's motion to suppress (Dkt. 129).

**BACKGROUND**

Pyrtle challenges the sufficiency of the affidavits supporting four search warrants issued during the investigation into his drug trafficking activities. The Court begins by detailing the contents of these affidavits.

## I.   **First Snapchat Warrant**

On October 1, 2021, Federal Bureau of Investigation Special Agent Timothy Kenny ("Agent Kenny") applied for a federal search warrant for data associated with Snapchat accounts named "kevikev357" and "big_t558." Based on photographs obtained from the "kevikev357" account pursuant to a prior warrant, Agent Kenny identified the "kevikev357" account as belonging to an individual named Kevin Cardoso (who had multiple open charges for drug trafficking offenses) and the "big_t558" account as belonging to Pyrtle. The warrant application was in furtherance of an investigation into a drug trafficking organization ("DTO")

operating in and around Brockton, Massachusetts. Agent Kenny expressed his belief that the two Snapchat accounts would contain evidence of drug trafficking.

Agent Kenny's affidavit described photographs and videos in Cardoso's Snapchat account that were indicative of marijuana trafficking. On February 27, 2021, Cardoso received a video from another user showing a clear baggie containing marijuana. Three days later, Cardoso received a picture of what Agent Kenny identified as a handwritten drug ledger. Agent Kenny explained that the ledger appeared to list quantities and prices of various marijuana strains. The next day, Cardoso again received several images and videos of a hand holding marijuana with captions listing different strains. Finally, on March 13, 2021, Cardoso responded with a picture of handwritten equations that Agent Kenny identified as another drug ledger depicting marijuana strains, numbers of pounds per strain, and the total costs for that quantity of each strain.

Six hours before sending this ledger, Cardoso messaged five images to Pyrtle's account. Four depicted a hand in a latex glove holding marijuana with captions listing different strains. The final image was a screenshot from the iPhone "Notes" application that read:

B17 1500 we paying 1300
Pk26 pk45 1900 we paying 1750
Ckp54 chocolate pk 2 bands we pod 1800

```
B28 1800 we paid 1650
B179 1800 we paid 1650
B58 1900 unless they buy multiple we paid 1750
```

Dkt. 132-2 ¶ 49 (cleaned up). Agent Kenny understood this screenshot as a message from Cardoso to Pyrtle explaining the strains of marijuana available for purchase, the amount they could sell each strain for, and the price they would pay per pound for each strain. The strains in this screenshot were the same as those listed in the drug ledger Cardoso sent to a different user six hours later. In addition, the per pound price that Cardoso listed in the screenshot for each strain matched the price used to calculate the total costs in the ledger.

Based on this information, a federal magistrate judge issued a search warrant for Pyrtle's Snapchat account on October 1, 2021 (the "October 2021 warrant").

## II.  Second Snapchat Warrant

On December 21, 2021, Agent Kenny applied for a second federal search warrant for data from Pyrtle's Snapchat account. Agent Kenny recounted the evidence in the October 2021 warrant application; identified Cardoso as a member of the DTO operating in and around Brockton; and listed Pyrtle's prior Massachusetts convictions for possession with intent to distribute a Class B controlled substance, assault with a dangerous weapon, and possession of a firearm.

4

Agent Kenny's affidavit then described new communications that investigators had obtained from Pyrtle's Snapchat account pursuant to the October 2021 warrant. On March 13, 2021, a few hours after Cardoso sent Pyrtle images of a hand holding marijuana with captions listing different strains, Pyrtle transmitted one of those images to two other users. Pyrtle then sent one of those users messages reading "B28 1750," "B179 1750," "pk45 pk26 1850," and "B58 1850," which Agent Kenny understood to identify the price of marijuana strains Pyrtle had available for sale. Dkt. 132-3 ¶ 53. These strains were also listed in the drug ledger Cardoso sent to Pyrtle with the images, and Pyrtle's prices were slightly higher than Cardoso's ledger said "we" were paying.

On June 7, 2021, Pyrtle messaged another Snapchat user with a photograph showing a barcode label for Mannite Cicogna. Agent Kenny explained that Mannite Cicogna is a cutting agent drug traffickers use to increase the weight of drugs and, thus, create more product to sell.

In September 2021, Pyrtle received two relevant sets of messages on Snapchat. The first, on September 2, was a picture of a hand holding marijuana with the caption "Break down and units avail/1375 p/400 qp/120 a zip/60 a half zip." Id. ¶ 56. Agent Kenny understood these figures to refer to the available prices for specific quantities of marijuana. Then, on September 16, Pyrtle

received several videos showing packages of various strains of marijuana.

Finally, Agent Kenny explained that on October 22, 2021, investigators executed a federal search warrant at a stash house utilized by Cardoso and other suspected DTO members. Law enforcement seized over six kilograms of cocaine, over a kilogram of fentanyl, Mannite Cicogna, and drug paraphernalia.

Based on Agent Kenny's affidavit, a federal magistrate judge issued a second search warrant for the contents of Pyrtle's Snapchat account on December 21, 2021 (the "December 2021 warrant").

## III. **Warrant to Search Apartments**

On January 24, 2022, Massachusetts State Police Trooper Matthew Morrissey ("Trooper Morrissey") applied for search warrants for two apartments, one at the Lenox Farms complex in Braintree, Massachusetts, and the other at the Montaje complex in Somerville, Massachusetts. Trooper Morrissey asserted that there was probable cause to believe that Pyrtle was engaged in drug trafficking and money laundering and that evidence of those crimes would be found at both locations.

### A.    **Evidence of Drug Trafficking**

Trooper Morrissey's affidavit first described evidence tying Pyrtle to drug trafficking. This evidence included all the Snapchat communications that formed the basis for the October 2021 and

December 2021 warrants. The affidavit recited Pyrtle's lengthy criminal history as well, which at the time included Massachusetts convictions for drug offenses involving a Class B substance and various violent crimes and firearms offenses.

Trooper Morrissey also described two more Snapchat messages found in Pyrtle's account. On August 20, 2021, Pyrtle sent Cardoso a voice message in which he said:

> Yo bro, [a person] has my number bro. He sent Rita over here the other day to get five P's . . . . He wants stock, I'll give him the bread for the ten P's I sold. He can take the rest of it back bro. I'm not gonna . . . the weed's bullshit bro. I'm trying to move it for him . . . .

Dkt. 132-5 ¶ 33. Understanding "P's" to refer to "pounds," Trooper Morrissey explained that he believed Pyrtle was telling Cardoso that he would give a supplier proceeds from ten pounds of marijuana he sold and that he was unhappy with the quality of the marijuana the supplier was giving him. On November 22, 2021, another user sent Pyrtle more images of a gloved hand holding marijuana above plastic bags that listed the names of different strains.

Lastly, the affidavit cataloged evidence uncovered during the investigation into Cardoso. On October 22, 2021, officers executed a search warrant at Cardoso's apartment in Newton, Massachusetts, and then arrested him. They seized a firearm, over $30,000 in cash, and numerous cell phones. After securing a warrant for Cardoso's iPhone, investigators found in the Notes application what appeared

to be a drug ledger last edited the day before the arrest. The ledger contained an entry reading "Big T 12000 + 6000," which Trooper Morrissey understood to refer to Pyrtle's nickname and his owing $18,000 to Cardoso. Id. ¶ 42.

**B.    Evidence Regarding Pyrtle's Use of and Access to Cash**

Trooper Morrissey's affidavit next described occasions in which law enforcement found Pyrtle and/or a close associate in possession of large amounts of cash. In May 2019, police conducted a traffic stop of a vehicle Pyrtle was driving and, after arresting him on two motor vehicle charges, found $12,730 in the car and another $1,821 on his person. In February 2020, investigators seized over $70,000 from Pyrtle and a female companion at Boston Logan Airport while they were boarding a flight on their way to Puerto Rico. And in June 2020, after Ashley Roostaie, a romantic partner of Pyrtle, was stopped driving a rental vehicle, officers located two boxes containing $190,590 in the car. K9 sniffs flagged the presence of narcotic odor on the cash seized in February and June 2020. The affidavit also included three pictures and videos from Pyrtle's Snapchat account depicting him wearing a gold chain or holding a large wad of cash.

Trooper Morrissey noted that these large amounts of cash were inconsistent with Pyrtle's enrollment in MassHealth and his statement in a December 2020 application for the Supplemental Nutrition Assistance Program that he was unemployed. Moreover, on

May 14, 2021, Pyrtle messaged another Snapchat user, "I don't got cash app" (a mobile payment system), "I only keep cash," and "I got more worries of being robbed than u." Id. ¶ 44. Investigators interpreted these statements to refer to drug proceeds Pyrtle kept on hand.

### C.    Evidence Regarding Pyrtle's Use of Another's Identity to Rent the Lenox Farms and Montaje Apartments

Trooper Morrissey then turned to Pyrtle's connections to the Lenox Farms and Montaje apartments. Both apartments were rented in the name of the same individual ("Victim 1"). Trooper Morrissey explained the basis for his belief that Pyrtle and Roostaie, neither of whom was the listed tenant of any unit at either complex, rented the apartments under Victim 1's identity.[2]

Roostaie sent Pyrtle a series of Snapchat messages regarding the Montaje complex between May 20 and June 12, 2021. These messages included links to livemontaje.com and floorplans of available apartments. Roostaie also messaged Pyrtle a photograph of a computer screen on the payment section of the Montaje website that listed Victim 1's name and "First Month's Rent Deposit $500.00." Id. ¶ 73. The following day, Roostaie sent Pyrtle pictures of a driver's license in Victim 1's name and a piece of

---

[2] For her role in this rental scheme, Roostaie has pleaded guilty to one count of conspiracy to commit access device fraud and aggravated identity theft in violation of 18 U.S.C. § 371 and one count of access device fraud and aiding and abetting the same in violation of 18 U.S.C. §§ 1029(a)(2) and 2. See Dkts. 153, 156.

paper with her social security number. Roostaie messaged Pyrtle the same day, "Good morning [Victim 1's name] same user name and pw." Id. Over the next week, Roostaie sent Pyrtle more messages about an apartment rental, such as "I emailed him back asking if that was the only one bedroom available and if so when is the next one bedroom available"; "One for 1000" and "Made out to Montaje Apartment"; and "I'll just email him and tell him I'm really just not happy with the space it's too small and see if I can go to another unit I'll see if there's some more and I'll reference those apartment numbers." Id. ¶¶ 73-74. Then, on June 12, Roostaie messaged Pyrtle an email and password, telephone number, and utility and payment account information in Victim's 1 name. That telephone number matched the one associated with the tenant of the apartment in question on the resident list maintained by the Montaje.

The affidavit described similar Snapchat messages about Lenox Farms. On March 8, 2021, Roostaie sent Pyrtle a photograph of an email from the Lenox Farms management to the complex's residents. On September 20, 2021, Roostaie messaged Pyrtle a screenshot from the iPhone "Notes" application. The note was titled "Lenox application info" and included usernames, passwords, access codes, and numbers for accounts with the company that owned Lenox Farms, utility and insurance providers, and a payment platform. Id. ¶ 65. Multiple of these usernames used Victim 1's name or email.

Trooper Morrissey also explained that Cardoso received a Snapchat audio message on March 29, 2021, in which another individual involved in the DTO suggested that Cardoso rent apartments in other people's names. The affidavit then described evidence that three apartments associated with Cardoso and where law enforcement found either drugs or drug paraphernalia were rented under the names of third parties.

Trooper Morrissey offered other evidence connecting Pyrtle to the two apartments. For the Montaje apartment, the affidavit explained that the tenant had requested two parking permits, one for a rental car and the other for a vehicle registered to an individual named Maria Goncalves. Law enforcement believed Goncalves was a romantic partner of Pyrtle with whom he had two children. Surveillance camera footage from the Montaje complex also showed Pyrtle entering the building on five dates in December 2021. With regard to Lenox Farms, Trooper Morrissey noted that 1) a telephone number associated with Pyrtle ordered food delivery from Grubhub to the complex at least forty times from late September 2020 to early March 2021; 2) Pyrtle told someone to meet him there on September 21, 2021; 3) officers observed vehicles registered to both Roostaie and Goncalves at the location in December and January 2022; and 4) Pyrtle was seen entering the apartment in question on January 4, 2022.

**D.    Other Evidence Connecting the Lenox Farms and Montaje Apartments to Drug Trafficking**

Finally, Trooper Morrissey described additional facts supporting his belief that evidence of Pyrtle's suspected drug trafficking activities would be found at the Lenox Farms and Montaje apartments.

Trooper Morrissey explained that two individuals suspected of drug trafficking visited the Lenox Farms location in December 2021 and January 2022. On December 5, a confidential informant conducted a controlled purchase of crack cocaine from an associate of Pyrtle and Cardoso named Raydolph Guiteau. Law enforcement secured a warrant to place a tracking device on Guiteau's vehicle and, on December 29, that vehicle arrived at the Lenox Farms apartment at 2:11 AM and remained there for close to an hour. On January 12, officers observed a car in the driveway that they later learned was rented to an individual named Vanderlee Fernandes. The affidavit listed Fernandes's lengthy criminal record, including a conviction for drug possession and a then-open possession with intent to distribute charge. Trooper Morrissey noted that the drug ledger on Cardoso's iPhone contained an entry for "Vanda," who investigators believed was Fernandes.

The affidavit relied on other evidence related to Lenox Farms as well. A Snapchat picture first sent on July 25, 2021, depicted Cardoso holding a large amount of cash in a kitchen. Based on

similarities between the picture and the online tour of a unit on the Lenox Farms website, investigators believed the picture was taken in one of the complex's apartments. On September 28, 2021, Pyrtle asked someone on Snapchat, "Can u bring [the bread] to Braintree?" (i.e., the town where Lenox Farms is located). Id. ¶ 93. And twice in late December 2021 and early January 2022, law enforcement observed a rental car parked at the apartment. This car was rented from the same company as a vehicle that officers saw Cardoso driving and that they later discovered had a hidden compartment.

Trooper Morrissey also addressed the Montaje apartment. On July 2, 2021, Cardoso told someone via text message that he was at the Montaje address. The key fobs issued to the tenant of the apartment were used to enter the unit on only about a quarter of the days from September 20, 2021, to January 5, 2022, which investigators deemed consistent with the apartment's use as a stash location. Moreover, surveillance footage from December 6, 2021, showed Pyrtle and a man with a suitcase walking to the elevator in the Montaje complex. The man exited the elevator with a smaller bag nine minutes later. Officers observed Pyrtle enter the building and walk to the elevator with a different man rolling a suitcase in surveillance footage from December 15, 2021. Based on his training and experience, Officer Morrissey determined that these

December 2021 observations were consistent with the delivery of drugs to the apartment (in exchange for cash the first time).

IV.  **Issuance and Execution of Warrants to Search Apartments**

A state judicial officer approved Trooper Morrissey's applications for search warrants for the Montaje and Lenox Farms apartments (the "January 2022 warrants"). Per Trooper Morrissey's applications, the January 2022 warrants authorized the seizure of, inter alia:

B.  Any controlled substances, including fentanyl, heroin, marijuana, cocaine, methamphetamine, and cocaine base.

C.  Firearms, ammunition, and any documents and items related to firearms and ammunition, including manuals, storage containers, receipts, invoices, literature, targets, shell casings, firearms accessories, magazines, scopes, silencers, and other items made for or anticipated to be used in conjunction with firearms.

D.  Items, materials, equipment and paraphernalia associated with the manufacturing, ordering, packaging, importation, possession, purchase, storage, distribution, and/or transportation of controlled substances, including, but not limited to, packaging materials, storage bins, containers, cutting agents, and scales.

E.  Items indicative of or evidencing the proceeds derived from illicit drug trafficking, including but not limited to large sums of money, financial instruments, precious metals, watches, jewelry, and documents evidencing the procuring or leasing of these items and other high-value items.

F.  Records and tangible objects relating to the ownership, occupancy, or use of the premises to be searched (such as utility bills, phone bills, rent payments, mortgage payments, photographs,

insurance documentation, receipts, and check registers).

Id. at 9, 73; Dkt. 132-6 at 5, 75.

State law enforcement executed the warrants on January 25, 2022. Officers found two packages of drugs at the Montaje apartment, each containing just under one kilogram of fentanyl and/or fentanyl analogue. They also seized drug packaging material, three digital scales with drug residue, and tax paperwork in Pyrtle's name. At the Lenox Farms apartment, officers located almost 1.5 kilograms of cocaine, over two kilograms of fentanyl and fentanyl analogue, eighty-seven grams of methamphetamine, and almost half a kilogram of marijuana. In addition, they seized over $50,000 in cash, multiple cell phones, drug presses, and cutting agent.

## DISCUSSION

Pyrtle argues that all four of the aforementioned warrants were constitutionally deficient. In making this argument, he contends that because Trooper Morrissey's affidavit in support of the January 2022 warrants included information obtained from his Snapchat accounts pursuant to the October and December 2021 warrants, a determination that any of the warrants were invalid requires suppression of the evidence seized from the Lenox Farms and Montaje apartments. See Utah v. Strieff, 579 U.S. 232, 237 (2016) ("[T]he exclusionary rule encompasses both the 'primary

evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" (quoting <u>Segura v. United States</u>, 468 U.S. 796, 804 (1984))). The Court therefore addresses the validity of each of the challenged warrants.[3]

## I.   **Legal Standards**

### A.   **Probable Cause**

The Fourth Amendment mandates that "warrants be based on 'probable cause.'" <u>United States v. Guerrero</u>, 19 F.4th 547, 549 n.1 (1st Cir. 2021) (quoting U.S. Const. amend. IV). Probable cause "is not a high bar" and demands "only 'the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act.'" <u>United States v. Cortez</u>, 108 F.4th 1, 8 (1st Cir.) (alteration in original) (quoting <u>United States v. Sheehan</u>, 70

---

[3] The government's brief is ambiguous as to whether it means to contest Pyrtle's "standing" to challenge the searches of the Montaje and Lenox Farms apartments, <u>i.e.</u>, whether he "had a legitimate expectation of privacy" in those locations. <u>United States v. John</u>, 59 F.4th 44, 48 (1st Cir. 2023) (quoting <u>United States v. Battle</u>, 637 F.3d 44, 48 (1st Cir. 2011)). At the suppression hearing, the Court asked the government directly if it was pressing such a challenge and wanted an evidentiary hearing on the issue. The government did not accept this offer. The Court therefore deems waived any argument that Pyrtle lacks standing to challenge the searches of the two apartments. <u>See</u> <u>United States v. Valdez</u>, 88 F.4th 334, 343 (1st Cir. 2023) ("Waiver is the intentional relinquishment or abandonment of a known right." (quoting <u>United States v. Carter</u>, 19 F.4th 520, 524 (1st Cir. 2021))).

F.4th 36, 44 (1st Cir. 2023)), cert. denied, 145 S. Ct. 578 (2024). Neither "a beyond-a-reasonable-doubt or even a more-likely-than-not showing" is required. United States v. Gonzalez-Arias, 946 F.3d 17, 25 (1st Cir. 2019). Moreover, "an affidavit submitted to show probable cause need not point to some straight-line connection but, rather, may rely on the affiant's connecting of a series of dots in a commonsense way." United States v. Adams, 971 F.3d 22, 32 (1st Cir. 2020).

To determine "whether a search warrant affidavit establishes probable cause," courts "'consider . . . the "totality of the circumstances"' based on 'the "facts and supported opinions set out within the four corners of the affidavit."'" Cortez, 108 F.4th at 8 (alteration in original) (citation omitted) (first quoting United States v. Sylvestre, 78 F.4th 28, 33 (1st Cir. 2023); and then quoting United States v. Corleto, 56 F.4th 169, 175 (1st Cir. 2022)). Courts must also "give significant deference to the magistrate judge's initial evaluation," disagreeing only if there is "no 'substantial basis' for concluding that probable cause existed.'" United States v. Chiu, 36 F.4th 294, 297 (1st Cir. 2022) (quoting United States v. Mendoza-Maisonet, 962 F.3d 1, 16 (1st Cir. 2020)).

The probable cause inquiry is two-fold: "[a]n application for a warrant must demonstrate probable cause to believe that (1) a crime has been committed -- the 'commission' element, and

(2) enumerated evidence of the offense will be found at the place searched -- the so-called 'nexus' element." United States v. Gonzalez, 113 F.4th 140, 148 (1st Cir. 2024) (quoting United States v. Roman, 942 F.3d 43, 50 (1st Cir. 2019)). In other words, there must be "a '"fair probability" -- not certainty -- that evidence of a crime will be found in a particular location.'" Corleto, 56 F.4th at 175 (quoting United States v. Lindsey, 3 F.4th 32, 39 (1st Cir. 2021)). Satisfaction of the nexus element "can be 'inferred from the type of crime, the nature of the items sought, . . . and normal inferences as to where a criminal would hide [evidence of a crime].'" Id. (alterations in original) (quoting Lindsey, 3 F.4th at 39).

The probable cause standard "include[s] a temporal component" that requires a determination of "'whether the totality of the circumstances . . . ' establishes a fair probability that evidence of the crime will be found in the place to be searched 'at about the time the search warrant would issue, rather than at some remote time.'" Gonzalez, 113 F.4th at 148 (alteration in original) (quoting United States v. Zayas-Dias, 95 F.3d 105, 113 (1st Cir. 1996)). "Information in an affidavit is stale if it 'establishe[s] probable cause at some point in the past but does not support probable cause at the time of the warrant's issuance.'" Id. (alteration in original) (quoting United States v. McLellan, 792 F.3d 200, 210 (1st Cir. 2015)). A court does not "assess an

affidavit's staleness [simply] by counting the number of days between the events described in the affidavit and a warrant's issuance." Adams, 971 F.3d at 33 (quoting United States v. Tiem Trinh, 665 F.3d 1, 13 (1st Cir. 2011)). Rather, a court must undertake a "context-dependent" inquiry that accounts for "the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information." United States v. Encarnacion, 26 F.4th 490, 498 (1st Cir. 2022) (quoting United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008)).

### B.    Particularity

In addition to the probable cause requirement, the Fourth Amendment demands that search warrants "particularly describe[e] the place to be searched, and the persons or things to be seized." Corleto, 56 F.4th at 176 (alteration in original) (quoting U.S. Const. amend. IV). "This particularity requirement exists 'to prevent wide-ranging general searches by the police.'" Id. (quoting United States v. Moss, 936 F.3d 52, 58 (1st Cir. 2019)). To satisfy the Fourth Amendment, a "warrant (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." Id. (quoting Lindsey, 3 F.4th at 40).

### C.  Good-Faith Exception

"The exclusionary rule provides that evidence seized in violation of the Fourth Amendment is ordinarily remedied by suppression." United States v. Pimentel, 26 F.4th 86, 90 (1st Cir. 2022). Under the good-faith exception to the exclusionary rule, however, "[s]uppression of evidence from an illegal search is 'inappropriate . . . if the officer who conducted the search acted in reliance upon the defective warrant and that reliance was objectively reasonable.'" Gonzalez, 113 F.4th at 148 (second alteration in original) (quoting Sheehan, 70 F.4th at 51). This exception "is based on the principle that, '[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" Id. at 148-49 (alteration in original) (quoting Herring v. United States, 555 U.S. 135, 144 (2009)). Suppression is therefore warranted "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights" but not "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . or when their conduct involves only simple, isolated negligence." Id. at 149 (alterations in original) (quoting Davis v. United States, 564 U.S. 229, 238 (2011)).

The good-faith exception does not apply when "the warrant is 'based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."'" United States v. Medina, 125 F.4th 310, 315 (1st Cir. 2025) (quoting United States v. Leon, 468 U.S. 897, 923 (1984)). Similarly, a court must suppress evidence seized pursuant to a warrant that was "so 'facially deficient . . . in failing to particularize the place to be searched or the things to be seized . . . that the executing officers [could not] reasonably presume it to be valid.'" United States v. Jackson, 118 F.4th 447, 454 (1st Cir. 2024) (alterations in original) (quoting Leon, 468 U.S. at 923).

"The government bears the 'heavy burden' of showing that its officers acted with objective good faith." Gonzalez, 113 F.4th at 149 (quoting United States v. Wurie, 728 F.3d 1, 13 (1st Cir. 2013)). Courts examine "all of the attendant circumstances at the time of the warrant application and its execution" to determine whether the good-faith exception applies. Id. (quoting United States v. Brunette, 256 F.3d 14, 17 (1st Cir. 2001)).

## II.  **The October 2021 Warrant**

Pyrtle first argues that the October 2021 warrant for data from his Snapchat account was not supported by probable cause. While Pyrtle concedes that Agent Kenny's affidavit offered sufficient information to justify searching Cardoso's Snapchat

account, he contends that the affidavit was inadequate to establish probable cause to believe that his account contained evidence of marijuana trafficking. Pyrtle also posits that the information in the affidavit had become stale by the time the magistrate issued the warrant on October 1, 2021.

The Court concludes that Agent Kenny's affidavit established probable cause to search Pyrtle's Snapchat account. To begin, the affidavit offered substantial evidence that Cardoso was using Snapchat to engage in marijuana trafficking. Cardoso received images and videos depicting different strains of marijuana on February 27 and March 3, 2021. See Dkt. 132-2 ¶¶ 42, 46. Between those dates, Cardoso also received a photograph of a handwritten note that Agent Kenny identified based on his training and experience as a drug ledger with quantities and prices of marijuana strains. See id. ¶¶ 43-45; see also Adams, 971 F.3d at 32 ("[A] law enforcement officer's training and experience may yield insights that support a probable cause determination." (quoting United States v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014))). Finally, Cardoso responded on March 13 with a picture of another drug ledger listing marijuana strains, quantities, and total costs amounting to almost $250,000. See Dkt. 132-2 ¶¶ 47-48.

Moreover, Agent Kenny's affidavit adequately tied Cardoso's marijuana trafficking to Pyrtle's Snapchat account in order to establish probable cause to search that account. Six hours before

22

Cardoso sent the drug ledger, he messaged Pyrtle four images of different strains of marijuana and a screenshot from the iPhone "Notes" application. See id. ¶ 49. Agent Kenny reasonably interpreted the screenshot -- which included lines such as "B17 1500 we payin[g] 1300" -- to list the prices for which Cardoso and Pyrtle could purchase and sell various strains of marijuana. Id. ¶ 50. And the strains of marijuana and prices per pound listed in the screenshot matched those used in the ledger Cardoso sent another Snapchat user six hours later. While the affidavit did not cite any response from Pyrtle to Cardoso's messages or describe any completed marijuana transactions, common sense suggests that Cardoso sent Pyrtle the screenshot and images of different strains of marijuana because they were buying and selling marijuana together. See Adams, 971 F.3d at 32 (explaining that the probable cause inquiry "leaves ample room for reasonable inferences based on common experience"). Given Cardoso's use of Snapchat to organize his transactions, including with Pyrtle, there was a fair probability that Pyrtle's Snapchat account would contain evidence of marijuana trafficking.

Finally, the information in Agent Kenny's affidavit was not stale when the magistrate issued the warrant on October 1, 2021. Although the marijuana-related Snapchat messages that Cardoso sent Pyrtle were from over six months prior, the question of staleness involves more than merely counting days on a calendar. See id. at

33. Instead, courts must consider, among other factors, the nature of the evidence that law enforcement asks to search for and seize, including how likely that evidence is to endure in the targeted location. See United States v. Joubert, 778 F.3d 247, 252 (1st Cir. 2015); Tiem Trinh, 665 F.3d at 14. In this case, Agent Kenny sought to obtain solely electronic data, which courts have routinely recognized is likely to remain recoverable for significant periods of time. See, e.g., United States v. Kvashuk, 29 F.4th 1077, 1087 (9th Cir. 2022); United States v. Espinoza, 9 F.4th 633, 636-37 (8th Cir. 2021); United States v. Caesar, 2 F.4th 160, 176 (3d Cir. 2021); United States v. Rees, 957 F.3d 761, 770 (7th Cir. 2020); United States v. Bosyk, 933 F.3d 319, 330-31 (4th Cir. 2019). Agent Kenny's affidavit described the data that Snapchat collects and retains and why that data may include evidence related to drug trafficking. See Dkt. 132-2 ¶¶ 9-32. The passage of more than six months between Cardoso's messages to Pyrtle and issuance of the October 2021 warrant did not undermine probable cause to believe that data from Pyrtle's Snapchat account would provide evidence of marijuana trafficking.

## III. **The December 2021 Warrant**

Pyrtle further contends that the magistrate lacked probable cause to issue the December 2021 warrant for additional data from his Snapchat account. As with the October 2021 warrant, Pyrtle asserts that Agent Kenny's affidavit in support of the December

24

2021 warrant failed to describe any completed marijuana transactions involving him or otherwise establish a fair probability that he and Cardoso were trafficking marijuana together. Pyrtle also raises a staleness challenge to this warrant, emphasizing that the latest Snapchat message described in the affidavit was sent three months before the warrant issued on December 21, 2021.

Again, Agent Kenny's affidavit offered sufficient information to establish probable cause to believe that Pyrtle's Snapchat account would contain evidence of marijuana trafficking. In addition to repeating the facts from his prior affidavit, Agent Kenny added that on March 13, 2021, Pyrtle forwarded an image of marijuana that Cardoso had sent him hours earlier to two other Snapchat users and subsequently messaged one of them listing what Agent Kenny reasonably understood to be marijuana strains and prices per pound (e.g., "B28 1750"). See Dkt. 132-3 ¶¶ 52-53. The fact that Pyrtle sent a message about prices for marijuana only a few hours after receiving images of strains and a drug ledger from Cardoso supports a powerful inference that Pyrtle and Cardoso were trafficking marijuana together and using their Snapchat accounts to further the endeavor.

There is more. Agent Kenny's affidavit also noted that Pyrtle 1) had a 2016 conviction for drug trafficking; 2) sent a barcode label for Mannite Cicogna, a common cutting agent, to another

Snapchat user on June 7, 2021; and 3) received a picture and videos of marijuana on Snapchat on September 2 and September 16, 2021, respectively, the former of which included a caption reading "[b]reak down and units avail/1375 p/400 qp/120 a zip/60 a half zip." Id. ¶¶ 37, 55-57; see United States v. Taylor, 985 F.2d 3, 6 (1st Cir. 1993) ("An affiant's knowledge of the target's prior criminal activity or record clearly is material to the probable cause determination."). Moreover, law enforcement seized over six kilograms of cocaine and over a kilogram of fentanyl from a stash house utilized by Cardoso on October 22, 2021. See Dkt. 132-3 ¶ 55. Taken together, the facts described in the affidavit established a fair probability that evidence of marijuana trafficking would be found in Pyrtle's Snapchat account.

Pyrtle's arguments to the contrary are unavailing. He tackles the pieces of evidence described in the affidavit one-by-one, arguing that each fact did not individually support a finding of probable cause. But "probable cause determinations are to be informed by the totality of circumstances and not by the consideration of different pieces of evidence in isolation." United States v. Anzalone, 923 F.3d 1, 4 (1st Cir. 2019). Additionally, Pyrtle's argument that the affidavit did not describe any completed marijuana transactions involving him ignores that "the government need not make a beyond-a-reasonable-doubt . . . showing to establish probable cause for a search."

Gonzalez-Arias, 946 F.3d at 25; see Cortez, 108 F.4th at 9 (rejecting the argument that an affidavit's failure to "demonstrate that [the defendant's] actions satisfied each of the elements of" a crime was fatal to a showing of probable cause).

Nor was the evidence cited in Agent Kenny's affidavit stale when the warrant issued on December 21, 2021, even though the latest marijuana-related Snapchat message described in the affidavit was from mid-September 2021. As with the October 2021 warrant, Agent Kenny sought a warrant to obtain solely electronic data from Pyrtle's Snapchat account, which was likely to be recoverable for a significant period of time. And the fact that Pyrtle sent and/or received messages regarding large quantities of marijuana in both March and September 2021 indicated that he was involved in "an ongoing pattern of conduct in the drug-trafficking arena" that included "large-scale transactions." Encarnacion, 26 F.4th at 498. Information about this type of operation has a "longer shelf life" both because "large-scale transactions may take weeks or months to mature," id., and because "drug conspiracies tend to be ongoing operations," United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996). The information presented in the affidavit gave sufficient reason to believe that evidence of marijuana trafficking would be found in data from

Pyrtle's Snapchat account despite the three-month gap between the latest Snapchat message and issuance of the warrant.[4]

## IV.  **The January 2022 Warrants**

That leaves the heart of Pyrtle's motion to suppress, which challenges the January 2022 warrants to search the Lenox Farms and Montaje apartments. Pyrtle argues that the warrants were not supported by probable cause, that the warrants were insufficiently particularized with regard to the items to be seized, and that Trooper Morrissey's affidavit in support of these warrants contained false statements warranting a <u>Franks</u> hearing. The Court tackles these arguments in turn.

### A.  **Probable Cause: Commission Element**

Pyrtle's argument that Trooper Morrissey's affidavit failed to establish probable cause to believe he was engaged in marijuana trafficking is without merit. Trooper Morrissey repeated the evidence from Agent Kenny's affidavit in support of the December 2021 warrant, which the Court has already determined was sufficient to demonstrate a fair probability that Pyrtle was trafficking marijuana.

---

[4] Because the October and December 2021 warrants were supported by probable cause, the Court need not address the government's arguments that the good-faith exception applies to those warrants and that Trooper Morrissey in good faith incorporated information obtained pursuant to those warrants into his affidavit in support of the January 2022 warrants.

Trooper Morrissey's affidavit offered additional information that only strengthened this inference. On August 20, 2021, Pyrtle sent Cardoso a voice message saying that he would give someone "the bread for the ten P's [he] sold" (i.e., ten pounds) and that he would relinquish "the rest of it" because "the weed's bullshit." Dkt. 132-5 ¶ 33. Pyrtle received more images of a hand holding marijuana above plastic bags that listed the names of different strains on November 22, 2021. See id. ¶ 37. The affidavit recounted that Pyrtle's criminal history included three prior drug convictions and that a drug ledger on Cardoso's iPhone, which was seized in October 2021, contained an entry ("Big T 12000 + 6000") that used Pyrtle's nickname. Id. ¶¶ 12, 39, 41-42. The affidavit also cited a video from Pyrtle's Snapchat account depicting him holding a large wad of cash, even though he was enrolled in MassHealth and had stated on a public assistance application that he was unemployed. See id. ¶¶ 45, 85. Finally, on three occasions between May 2019 and June 2020, law enforcement found Pyrtle and/or a close associate in possession of large amounts of unexplained cash. See id. ¶¶ 46-53; see also United States v. Hernandez-Mieses, 931 F.3d 134, 140 (1st Cir. 2019) (describing cash as a "common tool[] of the drug trade"). When combined with the facts repeated from Agent Kenny's affidavit, this information plainly established probable cause to believe that Pyrtle was trafficking marijuana.

Pyrtle's rejoinders go up in smoke. He again contests the import of individual pieces of evidence, such as whether the name "Big T" in Cardoso's drug ledger referred to him and whether his possession of cash was indicative of drug trafficking. These efforts to go into the weeds of the information in the affidavit, however, ignore that the evidence as a whole pointed to Pyrtle's role in a marijuana trafficking enterprise. And while Pyrtle correctly notes that some information presented in Trooper Morrissey's affidavit was months or even years old, there was no staleness problem. More recent evidence of Pyrtle's marijuana trafficking activities corroborated the older information, see United States v. Bregu, 948 F.3d 408, 416 (1st Cir. 2020) ("Staleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material." (quoting United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992))), and the affidavit depicted a substantial and ongoing trafficking operation that was unlikely to fold overnight, see Gonzalez-Arias, 946 F.3d at 25; see also United States v. Magee, 834 F.3d 30, 35 n.5 (1st Cir. 2016) ("[F]or crimes of an ongoing nature, it is appropriate for an affidavit to contain some information that is a few years old,

especially when that information simply serves to corroborate more recent information.").[5]

**B.    Probable Cause: Nexus Element**

A closer question is whether Trooper Morrissey's affidavit established an adequate nexus between Pyrtle's marijuana trafficking and the Lenox Farms and Montaje apartments. Pyrtle points out that the affidavit did not include information from any confidential informant who claimed to have seen marijuana or other drugs inside the apartments or who was involved in a drug transaction connected to the apartments. Pyrtle also emphasizes that the First Circuit has "rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity." <u>Roman</u>, 942 F.3d at 51.

The Court holds that Trooper Morrissey's affidavit supported probable cause to believe that law enforcement would find evidence of Pyrtle's marijuana trafficking in the Lenox Farms and Montaje

---

[5] Pyrtle notes in passing that "marijuana was . . . legal to obtain in Massachusetts" at the time the January 2022 warrants were issued. Dkt. 140 at 14. If he means to argue that the legalization of recreational marijuana in Massachusetts negates probable cause to believe he committed a state crime, the argument is both inadequately developed and meritless. Pyrtle used Snapchat to arrange transactions involving large quantities of marijuana, and at least some of those transactions involved an individual (Cardoso) who was connected to stash houses where law enforcement seized significant amounts of cocaine and fentanyl. Pyrtle also had a prior conviction for possession with intent to distribute a Class B controlled substance. These facts established probable cause to believe that Pyrtle was engaged in marijuana trafficking not sanctioned by state law.

apartments. The affidavit did not seek permission to search the two apartments simply because law enforcement believed that Pyrtle was occupying them. Rather, Trooper Morrissey offered "specific observations" connecting Pyrtle's marijuana trafficking to the apartments. Id. (quoting United States v. Ribeiro, 397 F.3d 43, 50 (1st Cir. 2005)).

As an initial matter, Pyrtle does not contest that the affidavit established that he and Roostaie rented the apartments in question under Victim 1's identity. See Dkt. 132-5 ¶¶ 64-68, 73-78. This effort to hide the identity of the tenant of the apartments suggested that Pyrtle and/or Roostaie were using the locations for a clandestine purpose. In addition, the affidavit described evidence that, at the suggestion of another drug trafficker, Cardoso arranged for multiple stash houses to be rented under the names of other individuals. See id. ¶¶ 54-60. Given the information connecting Pyrtle to marijuana trafficking generally, and to Cardoso's trafficking enterprise specifically, it was reasonable to believe that Pyrtle was also using the covertly rented apartments at the Lenox Farms and Montaje apartments as stash locations. Moreover, within the two months before the warrants issued, Pyrtle was identified on surveillance footage entering the Montaje complex five times, and law enforcement saw Pyrtle and two female companions at the Lenox Farms apartment. See

32

id. ¶¶ 80, 83, 86-87. These sightings supported a reasonable belief that Pyrtle was continuing to use the two apartments.

The affidavit offered other information tying the apartments to Pyrtle's trafficking activities. In the month before the warrants issued, vehicles affiliated with two individuals whom law enforcement believed to be involved in drug trafficking visited the Lenox Farms apartment. One vehicle was driven by an associate of Pyrtle and Cardoso (Guiteau) from whom a confidential informant had conducted a controlled purchase of crack cocaine a few weeks earlier.[6] See id. ¶¶ 69-72. The second vehicle was rented by an individual (Fernandes) with a then-open charge for possession with intent to distribute whose name appeared in a drug ledger on Cardoso's iPhone. See id. ¶¶ 42, 91. That the vehicles of two individuals whom law enforcement reasonably suspected of drug trafficking came to the apartment within a two-week period

---

[6] Pyrtle raises a perfunctory argument that Trooper Morrissey's affidavit provided insufficient facts to demonstrate the reliability of the information provided by the confidential informant. This argument is meritless. The affidavit explained that law enforcement had independently verified information previously provided by this informant, and the controlled purchase between the informant and Guiteau that officers observed corroborated the informant's statement that Guiteau was selling crack cocaine. See Dkt. 132-5 ¶¶ 69 & n.15, 71; see also United States v. Leonard, 17 F.4th 218, 225 (1st Cir. 2021) (noting that factors relevant to assessing the reliability of a confidential informant include "whether the affidavit establishes the probable veracity and basis of knowledge of persons supplying hearsay information" and "whether some or all [of] the informant's factual statements were corroborated wherever reasonable and practicable" (alteration in original) (quoting Tiem Trinh, 665 F.3d at 10)).

supported an inference that Pyrtle was using the location for marijuana trafficking activities.

The affidavit also included a Snapchat picture depicting Cardoso holding large amounts of cash in a kitchen, which law enforcement believed was in a Lenox Farms apartment based on similarities with the kitchen in an online tour of a unit on the complex's website. See id. ¶¶ 96-97. Given that various Snapchat messages linked Pyrtle's and Cardoso's trafficking activities, this picture provided some reason to believe that Pyrtle and Cardoso were using the Lenox Farms apartment for that joint endeavor. Pyrtle criticizes the affidavit for failing to prove that the picture of Cardoso was not taken in one of Cardoso's own stash houses, "[b]ut probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." District of Columbia v. Wesby, 583 U.S. 48, 61 (2018). Together with Pyrtle and Roostaie's rental of the Lenox Farms apartment in Victim 1's name, these facts demonstrated a substantial connection between the apartment and Pyrtle's marijuana trafficking.

The connection between the Montaje apartment and Pyrtle's marijuana trafficking is less strong. The key fobs issued to the tenant of that apartment were used to enter the unit on only about a quarter of the days from September 20, 2021, to January 5, 2022. See Dkt. 132-5 ¶ 79. Twice in December 2021, surveillance footage captured Pyrtle walking to the elevator at the Montaje complex

with individuals carrying heavy suitcases that law enforcement suspected contained drugs. See id. ¶¶ 81-82. On one of those two occasions, the individual came out of the elevator nine minutes later with a smaller bag. See id. ¶ 81. Pyrtle correctly notes that the affidavit did not cite any evidence that these individuals entered the apartment rented under Victim 1's name (as opposed to a different unit), and it was not clear from the evidence that Pyrtle and those individuals were together. But given the compelling evidence that Pyrtle was engaged in marijuana trafficking, together with the clandestine method of renting the apartment and the infrequent use of the apartment, there was probable cause to think that the Montaje apartment would contain evidence of marijuana trafficking.

Finally, the Court stresses that even if Trooper Morrissey's affidavit fell short of establishing probable cause to believe that evidence of Pyrtle's marijuana trafficking would be found at the Lenox Farms and Montaje apartments, the government has met its burden to show that the good-faith exception to the exclusionary rule would apply. Trooper Morrissey offered multiple specific reasons to think that Pyrtle was using each apartment for his trafficking activities. The affidavit was not "so bare bones or conclusory" with regard to the nexus element that it would fail under the good-faith exception. Gonzalez, 113 F.4th at 150. Put differently, "[a]t the very least, the key facts amount to

35

'evidence sufficient to create disagreement among thoughtful and competent judges as to the existence of probable cause.'" Id. at 151 (quoting Leon, 468 U.S. at 926). A reasonable officer could have believed that Trooper Morrissey's affidavit demonstrated probable cause for the searches of the Lenox Farms and Montaje apartments. See id. at 152. Suppression of the fruits of those searches is therefore not warranted.[7]

### C.    Particularity

Pyrtle next challenges the January 2022 warrants on the basis that they failed to adequately particularize the items that law enforcement was permitted to seize from the Lenox Farms and Montaje apartments. Relying on the Massachusetts Appeals Court's recent decision in Commonwealth v. Padilla, 249 N.E.3d 1160 (Mass. App. Ct. 2024), Pyrtle argues that the warrants improperly authorized the seizure of "[a]ny controlled substances, including fentanyl, heroin, marijuana, cocaine, methamphetamine, and cocaine base," Dkt. 132-5 at 5; Dkt. 132-6 at 5, even though Trooper Morrissey's

---

[7] Pyrtle has submitted an affidavit that law enforcement used to obtain federal search warrants for two locations associated with Cardoso. See Dkt. 132-4. Pyrtle contends that this affidavit made a stronger showing of probable cause than Trooper Morrissey's and, thus, demonstrates that the officers investigating Cardoso and Pyrtle knew that Trooper Morrissey's affidavit was inadequate. This comparative exercise is unpersuasive: the strength of the showing of probable cause in one affidavit says little about whether law enforcement could have reasonably believed that the information in a different affidavit surpassed the probable cause threshold.

affidavit at best connected him only to marijuana trafficking. Pyrtle contends that the follow categories of items that the warrants authorized law enforcement to seize were also overbroad: 1) "[f]irearms, ammunition, and any documents and items related to firearms and ammunition"; 2) "[i]tems, materials, equipment and paraphernalia associated with" drug trafficking; 3) "[i]tems indicative of or evidencing the proceeds derived from illicit drug trafficking"; and 4) "[r]ecords and tangible objects relating to the ownership, occupancy, or use of the" Lenox Farms and Montaje apartments. Id.

Pyrtle's arguments about the particularity of the January 2022 warrants are all unconvincing. As to the breadth of the controlled substances that the warrants authorized law enforcement to seize, the government argues that Trooper Morrissey's affidavit established probable cause to believe that drugs besides marijuana would be found in the Lenox Farms and Montaje apartments, primarily because officers found cocaine, fentanyl, and methamphetamine when executing search warrants for two stash houses connected to Cardoso. See Dkt. 132-5 ¶¶ 38, 55. Additionally, the First Circuit has generally found no constitutional infirmity with warrants that broadly authorize the seizure of any illegal drugs. See, e.g., United States v. Jenkins, 680 F.3d 101, 106-07 (1st Cir. 2012) (Souter, J.); United States v. Parker, 549 F.3d 5, 10 (1st Cir.

2008); <u>United States v. Morris</u>, 977 F.2d 677, 680-82 (1st Cir. 1992).

But even if the January 2022 warrants were overbroad with regard to the list of controlled substances, suppression of the cocaine, fentanyl, fentanyl analogue, and methamphetamine seized at the Lenox Farms and Montaje apartments would not be warranted. "The remedy in the case of a seizure that casts its net too broadly is . . . not blanket suppression but partial suppression." <u>United States v. Aboshady</u>, 951 F.3d 1, 9 (1st Cir. 2020) (alteration in original) (quoting <u>United States v. Falon</u>, 959 F.2d 1143, 1149 (1st Cir. 1992)); <u>see</u> <u>United States v. Giannetta</u>, 909 F.2d 571, 580 n.7 (1st Cir. 1990) (rejecting the "argument that because some of the seized evidence might be tainted by the absence of probable cause, all of it should be suppressed"). In other words, any overbreadth in the January 2022 warrants would not render the searches of the two apartments entirely unlawful. <u>See</u> <u>United States v. Diaz</u>, 841 F.2d 1, 4 (1st Cir. 1988) (explaining that a court "need not invalidate the entire warrant simply because a portion of it impermissibly allows seizure of certain items").

Moreover, within the valid scope of the searches -- which, as discussed above, included permission to look for marijuana -- law enforcement "would have been entitled to seize other . . . illegal drugs as suspected contraband if found in plain view in the course of the narrower search." <u>Parker</u>, 549 F.3d at 10 (rejecting the

argument that a "search warrant was impermissibly broad because it allowed police to search for 'weapon[s]' and 'illicit drugs'" even though "there was only probable cause to support a search for marijuana and a single gun" (alteration in original)); see Hernandez-Mieses, 931 F.3d at 140 (explaining that the plain view doctrine "permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself" (quoting United States v. Gamache, 792 F.3d 194, 199 (1st Cir. 2015))). At the very least, then, the seizure of cocaine, fentanyl, fentanyl analogue, and methamphetamine from the Lenox Farms and Montaje apartments were lawful under the plain view doctrine.

Pyrtle's other arguments fare no better. Because Trooper Morrissey's affidavit offered probable cause to believe that Pyrtle was engaged in marijuana trafficking at the Lenox Farms and Montaje apartments, the seizure of "[i]tems, materials, equipment and paraphernalia associated with" drug trafficking was warranted. The inclusion of "[r]ecords and tangible objects relating to the ownership, occupancy, or use of the" two apartments in the list of items to be seized was also justified, as such records and objects would be evidence that Pyrtle was responsible for any trafficking activities occurring at those locations. And the affidavit documented Pyrtle's ownership of a gold chain and multiple

instances in which he or a close associate possessed large amounts of cash, see Dkt. 132-5 ¶¶ 45-53, which supported the seizure of "[i]tems indicative of or evidencing the proceeds derived from illicit drug trafficking." Though somewhat broad, these categories were sufficiently particularized for purposes of the Fourth Amendment. See Jenkins, 680 F.3d at 107 ("[R]easonableness is the standard for the required specificity in a warrant."); Morris, 977 F.2d at 681 ("General descriptions in warrants . . . have been accepted when the surrounding circumstances render it reasonable.").

Lastly, the Court need not decide whether Trooper Morrissey's affidavit justified the inclusion of "[f]irearms, ammunition, and any documents and items related to firearms and ammunition" in the list of items to be seized. Law enforcement did not seize any such items during the searches. Thus, even if the Court were to determine that the affidavit did not provide an adequate basis to support the seizure of these items, there is no evidence to suppress under the partial suppression rule.

### D.    **Franks** Hearing

Finally, Pyrtle requests a Franks hearing in his motion to suppress. If "incorrect information is contained in an affidavit that is used to obtain a warrant, the trial court may hold a so-called Franks hearing to determine whether evidence obtained with the warrant should be excluded at trial." United States v. O'Neal,

17 F.4th 236, 244 (1st Cir. 2021). A <u>Franks</u> hearing is only warranted, however, "should the defendant make '"a substantial preliminary showing" that: 1) the warrant affidavit contains a false statement made "knowingly and intentionally, or with reckless disregard for the truth" and 2) . . . "the allegedly false statement was necessary to the finding of probable cause."'" <u>United States v. Pérez-Greaux</u>, 83 F.4th 1, 32 (1st Cir. 2023) (quoting <u>United States v. Hicks</u>, 575 F.3d 130, 138 (1st Cir. 2009)).

Pyrtle has failed to make the substantial preliminary showing necessary to justify a <u>Franks</u> hearing. While he asserts that Trooper Morrissey's affidavit contains "several" misstatements, he offers no specific examples. Dkt. 129 at 4. Such a conclusory assertion that a warrant application contained falsehoods is insufficient to entitle a defendant to a <u>Franks</u> hearing. See <u>Pérez-Greaux</u>, 83 F.4th at 33 ("To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." (quoting <u>United States v. Southard</u>, 700 F.2d 1, 8 (1st Cir. 1983))). Pyrtle's true argument appears to be that the facts outlined by Trooper Morrissey did not support his ultimate conclusion that probable cause existed to search the Montaje and Lenox Farms apartments. That conclusion was, however, "as much [a] matter[] of opinion as [a] matter[] of fact, and [Pyrtle] has made no convincing showing that [Trooper Morrissey] knew the statement[]

w[as] false, yet nonetheless included [it] in his affidavit[]."
United States v. Gordon, 871 F.3d 35, 51 (1st Cir. 2017). The Court
therefore denies Pyrtle's request for a Franks hearing.[8]

### ORDER

For the foregoing reasons, Pyrtle's motion to suppress (Dkt.
129) is **DENIED**.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge

---

[8] Given its resolution of Pyrtle's other arguments, the Court need
not address his contention regarding the silver-platter doctrine.